[Civ. No. 51318. Second Dist., Div. Five. Mar. 20, 1978.]

MILDRED I. COLBY et al., Plaintiffs and Appellants, v.
EDWARD J. SCHWARTZ et al., Defendants and Respondents;
FIDELITY AND CASUALTY COMPANY OF NEW YORK,
Intervener and Respondent.

**COUNSEL**

Bell & Shapiro and Sydney Halem for Plaintiffs and Appellants.

Kirtland & Packard, Wallace C. Reed and Robert E. Moore, Jr., for Defendants and Respondents.

Shelley M. Mercer, Lewis S. Fleishman and John M. Fredenburg as Amici Curiae on behalf of Defendants and Respondents.

Kendig, Stockwell & Gleason and William R. Jackson for Intervener and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—In their complaint, plaintiffs, the widow and surviving adult children of decedent Walter Colby, named Doctors Avol, Schwartz, Uriu, Engel, and the Hawthorne Community Hospital as defendants. Plaintiffs alleged that each negligently diagnosed, cared for, and treated plaintiffs' decedent. There is also an allegation that defendants abandoned the decedent after initiating medical care. Plaintiffs claimed that defendants' conduct was the proximate cause of the decedent's death.

Thereafter, Avol, Schwartz and Uriu successfully moved for summary judgment based on the Good Samaritan legislation contained in Business and Professions Code sections 2144 and 2144.5.[1] The trial court ordered each dismissed from the action. Plaintiffs appeal only from the order dismissing Schwartz and Uriu. The separate order dismissing Avol is not part of this appeal. Concluding that sections 2144 and 2144.5 are not applicable to the medical services rendered by defendants, and that there are material triable issues of fact present, we reverse the trial court's order of dismissal.

The declarations and exhibits filed in support and in opposition of defendants' motion reveal that in the early morning hours of August 6, 1972, plaintiffs' decedent sustained serious physical injuries from an automobile accident. The decedent was taken by ambulance to the emergency room of Hawthorne Community Hospital. Doctor Avol treated the decedent there and then ordered him transferred to an intensive care unit. On the day of the accident, defendants were serving on the hospital's emergency call surgical panel. After arriving at the hospital at 1 p.m., Schwartz examined the decedent and ordered him prepared for an exploratory surgical procedure. The procedure took place in the hospital operating room and was commenced at 3 p.m. Schwartz acted as chief surgeon and Uriu served as assistant surgeon. During the course of the operation, at approximately 4:30 p.m., the

---

[1]Unless otherwise specifically noted, all section references are to the Business and Professions Code.

decedent expired. The medical examiner's report attributed the cause of death to hemoperitoneum which was due to lacerations of multiple abdominal organs. The lacerations were caused by the blunt force of the automobile accident upon those organs.

In their respective declarations, each defendant claimed that he had rendered "emergency medical care" upon the decedent and that their care "conformed to the standard exercised by prudent physicians acting under the same or similar circumstances."

■ Defendants contend that their declarations, independently of the operation of sections 2144 and 2144.5, establish that they were, as a matter of law, not negligent. Measured against the usual rules of appellate review, we find that defendants' declarations are insufficient. The declarations do not establish every element required, including those matters which plaintiffs have the burden of proving at trial, for a judgment in their favor. (*Fuller* v. *Goodyear Tire & Rubber Co.* (1970) 7 Cal.App.3d 690, 692-693 [86 Cal.Rptr. 705].) The declarations are deficient in that they contain in part only conclusions. (*Kramer* v. *Barnes* (1963) 212 Cal.App.2d 440, 446 [27 Cal.Rptr. 895].) The declarations merely assert without supportive factual allegations that defendants met the standard of care required of them. Thus, the question of whether defendants fulfilled their duty of care to the decedent remains a material triable issue of fact, particularly as to the timeliness of diagnosis and remedial steps taken. (*Barker* v. *Wah Low* (1971) 19 Cal.App.3d 710, 712 [97 Cal.Rptr. 85].) Under such circumstances, a summary judgment cannot be properly granted. (*Pettus* v. *Standard Cabinet Works* (1967) 249 Cal.App.2d 64, 69 [57 Cal.Rptr. 207].) Respondents argue that the declarations filed in defendant Avol's summary judgment motion may not be used as responsive matter. Their having been incorporated in the opposition to the Schwartz-Uriu motion, they were and are properly before the court. However, defendants argue that the application of sections 2144 and 2144.5 removes all triable issues of fact and renders the case ripe for summary adjudication.

### Historical Background of California's Good Samaritan Legislation

As a general rule, the common law did not place upon a person the affirmative duty to render aid to another in peril. However, a person who nevertheless undertook to give assistance, assumed a legal duty to act with reasonable care. Failure to use reasonable care, regardless of

humanitarian motives, would subject the volunteer to tort liability. (Prosser, Torts (4th ed. 1971) § 56, pp. 338-350.)

Thus, at common law, a physician could with legal impunity[2] refuse to aid a stranger in need of immediate medical care, but a physician who stopped and gave aid created a doctor-patient relationship and thereby assumed a duty of reasonable care towards the patient. Further, under the exigent circumstances of this type of medical care, the quality and quantity of a physician's treatment is necessarily reduced. As a result, the chances of medical failure are increased. Thus, notwithstanding a best efforts attempt, a physician who rendered emergency medical care became the natural target of malpractice actions.

At common law, a physician who rendered emergency care was protected from malpractice claims to the extent that he was only required to exercise the degree of care that other physicians would have given under similar circumstances. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) In an emergency, the rendering physician was not held to the same standard of judgment and performance as he was under normal conditions. However, while the common law emergency standard of care operated to reduce the chances for a plaintiff's success at trial, it failed to discourage the commencement of malpractice actions. Malpractice claims still went to the jury for determination. The limited protection afforded to physicians by the common law did not sufficiently allay their fears of legal action, and thus the common law worked as a serious deterrent to the rendition of needed medical aid in emergency situations. (Prosser, *supra,* p. 344.)

In response, California, in 1959, became the first state to enact Good Samaritan legislation altering the common law rights and obligations in the medical malpractice area.[3] As originally enacted, section 2144 provides:[4]

---

[2]Section 5 of the Principles of Medical Ethics of the American Medical Association places upon a physician the moral obligation to give emergency medical care.

[3]Currently, all 50 states and the District of Columbia have enacted some type of Good Samaritan legislation.

[4]Section 2144 was amended (Stats. 1976, ch. 824, § 1) defining "scene of the emergency" in a "medical disaster" as including emergency rooms of hospitals.

"No person licensed under this chapter, who in good faith renders emergency care at the scene of the emergency, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care."

In 1969, companion section 2144.5 was added. It reads:

"No person licensed under this chapter, who in good faith upon the request of another person so licensed, renders emergency medical care to a person for a medical complication arising from prior care by another person so licensed, shall be liable for any civil damages as a result of any acts or omissions by such licensed person in rendering such emergency medical care."[5]

■ Defendants urge that they have met all of the requirements of sections 2144 and 2144.5 and therefore are immune from civil liability. However, it is established by their own declarations that they operated upon the decedent as part of their normal course of practice as members of the hospital emergency call panel. Even assuming that defendants have fulfilled the other requirements of sections 2144 and 2144.5, defendants acting in this capacity did not render the type of physician care which constitutes "emergency [medical] care" as it is used in those sections. Therefore, we hold that sections 2144 and 2144.5 are inapplicable in the instant case.

There is no recorded legislative history or relevant interpretative case law[6] for either section. ■ However, the apparent legislative purpose underlying both sections is to induce physicians to render medical aid to individuals who, though in need of such care, were not receiving it. (Comment (1963) 51 Cal.L.Rev. 816, 817-818.) This legislative purpose is to be effectuated by denying the patient a right of action and thereby discouraging even the commencement of suit. Sections 2144 and 2144.5

---

[5]Another section of the same number added by Statutes 1977, chapter 668, section 1, provides civil immunity to physicians and podiatrists, under defined circumstances, from damages for injuries or death because of failure to inform.

[6]The Good Samaritan legislation contained in section 2144 commences in that section's second paragraph. The section's first paragraph, which reads in pertinent part, "[n]othing in this chapter prohibits service in the case of emergency . . ." has been used as a defense to charges of unlicensed or unauthorized medical practice. "Emergency" as used in that context has been defined in *People* v. *Lee Wah* (1886) 71 Cal. 80 [11 P. 851]; *Newhouse* v. *Bd. of Osteopathic Examiners* (1958) 159 Cal.App.2d 728 [324 P.2d 687], and *Rilcoff* v. *State Board of Medical Examiners* (1949) 90 Cal.App.2d 603 [203 P.2d 844].

should be construed to produce a result consistent with the legislative purpose. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222 [110 Cal.Rptr. 144, 514 P.2d 1224].) Granting immunity to defendants for the medical care they rendered to the decedent would not serve the legislative purpose.

Sections 2144 and 2144.5 were enacted to aid the class of individuals who, though requiring immediate medical care, were not receiving it. Typically, it was the roadside accident victim who, as a result of the strictures of the common law malpractice doctrines, was left uncared for. However, hospital patients, such as the decedent have historically enjoyed the benefits of full medical attention. There is no need for special legislation to encourage physicians to treat this class of individuals.

On the other side of the doctor-patient equation, sections 2144 and 2144.5 were not directed towards the class of physicians of which defendants are members. Physicians, like defendants, who treat patients requiring immediate medical care as part of their normal course of practice do not need the added inducement that immunity from civil liability would provide. Moreover, excusing such physicians of their negligence could have the adverse effect of lowering the quality of their medical care without justification. And further, to extend immunity to such physicians would deny an overly broad spectrum of malpractice victims of their legal remedies.

These sections were directed towards physicians who, by chance and on an irregular basis, come upon or are called to render emergency medical care. Often, under these circumstances, the medical needs of the individual would not be matched by the expertise of the physician and facilities could be severely limited. The general practitioner might well find himself treating an individual for needs outside his training or the specialist forced to practice in an unrelated speciality. However, in the instant case, defendants in performing the exploratory surgical procedure were practicing within their area of expertise and with all of the benefits of full hospital facilities. It is therefore not unreasonable to hold them to the level of skill and training required under such circumstances. Further, there is no indication in the record that the exigencies of decedent's condition placed any unusual or unforeseen demands on defendants' skills.

In one of the few reported cases interpreting a Good Samaritan legislation, the Arizona Supreme Court, in *Guerrero* v. *Copper Queen*

*Hospital* (1976) 112 Ariz. 104 [537 P.2d 1329], held that its statute did not encompass medical services rendered by hospital personnel. The court stated, "[t]he apparent purpose of this [A.R.S. § 32-1471] statute is to relieve the burden of liability on individuals who choose to or not to render aid to others in emergency situations. We are not dealing with the same problem in this instance. An individual may, in good faith, help another in a crisis with untoward results for which he should not be penalized or the same may not help, perhaps knowing that he lacks the necessary expertise to be of aid. The medical expertise of a hospital staff is assumed. The statute is not applicable to emergency medical treatment in a hospital." (537 P.2d at p. 1331.)

█ The enactment of Good Samaritan legislation represents the resolution of competing interests. On the one hand, there is an interest in the vindication of the rights of the malpractice victim. On the other hand, there is the need to encourage physicians to render emergency medical care when they otherwise might not. Where applicable, the legislation favors the latter over the former. However, where, as here, physicians are rendering such aid as part of their normal course of practice, we hold the balance of interests must favor the redress of malpractice rights.

█ There being material triable issues of fact present in the case and sections 2144 and 2144.5 being inapplicable, the order dismissing defendants entered pursuant to their summary judgments is reversed.

Reversed.

Ashby, J., and Hastings, J., concurred.

The petition of the defendants and respondents for a hearing by the Supreme Court was denied May 18, 1978.